IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

GREGORY SMITH,

    Petitioner,

vs.                      No. 10-1158-JDB-egb

TONY PARKER,

    Respondent.

---

ORDER ON PENDING MOTIONS,
DENYING PETITION PURSUANT TO 28 U.S.C. § 2254,
DENYING CERTIFICATE OF APPEALABILITY,
CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH,
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

---

Before the Court is the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition") filed by Petitioner, Gregory Smith, Tennessee Department of Correction prisoner number 267603, an inmate at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee (Docket Entry ("D.E.") 1), and the Motion to Construe Answer as Motion for Summary Judgment filed by Respondent, NWCX Warden Tony Parker (D.E. 16). For the reasons stated below, the inmate's Petition is DENIED and thus, the warden's motion is also DENIED as moot.

## I.    BACKGROUND

### A.    State Court Procedural History

Smith was indicted by a grand jury in Madison County, Tennessee, for the aggravated rape of L.C. (D.E. 9-1 at 7-8.) After a trial in the Madison County Circuit Court on May 16, 2006, the jury returned a guilty verdict on the lesser offense of aggravated sexual battery. (D.E. 9-3 at 47-48.) At a sentencing hearing on July 10, 2006, Smith was sentenced to a term of imprisonment of twelve years at 100%. (D.E. 9-5 at 19-20.) The Tennessee Court of Criminal Appeals affirmed. State v. Smith, No. W2006-01962-CCA-R3-CD, 2007 WL 3132938 (Tenn. Crim. App. Oct. 26, 2007), *appeal denied* (Tenn. Apr. 7, 2008).

On July 16, 2008, the inmate filed a *pro se* petition pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Madison County Circuit Court. (D.E. 9-6 at 5-17.) Counsel was appointed to represent Smith (id. at 21-22), and an amended petition was filed on August 15, 2008 (id. at 27-29). On September 8, 2008, a postconviction hearing was held, and the postconviction court denied the petition. (D.E. 9-6 at 30-31.) The Tennessee Court of Criminal Appeals affirmed. Smith v. State, No. W2008-02071-CCA-R3-PC, 2009 WL 3029666 (Tenn. Crim. App. Sept. 23, 2009), *appeal denied* (Tenn. Mar. 15, 2010).

The Tennessee Court of Criminal Appeals summarized the evidence introduced at trial:

The minor victim, L.C., will be referred to by her initials. L.C. testified that she was fourteen years old at the time of the incident and lived with her mother, Emma Smith; her stepfather, Defendant; and her uncle, Willie Clark. On July 2, 2005, L.C. was alone in the house with Defendant while Ms. Smith was at work, and Mr. Clark had gone to the store. Defendant came into the room where L.C. was lying on the couch and asked for the telephone. Defendant walked over to the couch when L.C. did not answer. L.C. said Defendant touched her in the vaginal area. L.C. asked Defendant what he was doing. Defendant did not respond and tried to unbutton L.C.'s blue jean shorts. L.C. said that she started kicking at Defendant and struck him in the face with her foot. Defendant removed L.C.'s clothes and threw her on the floor.

L.C. stated that Defendant "started shoving his penis" in her as she continued to fight. L.C. said Defendant's penis was not inside her vagina for a long time. Defendant told L.C. that he was not going to do anything to make L.C. pregnant. Defendant then removed his penis and began biting L.C. in the vaginal area which L.C. said was painful. L.C. said she tried to get away from Defendant, but every time she moved, Defendant moved with her, and then Defendant "just stopped." L.C. said that Defendant did not ejaculate during the incident.

L.C. went in the bathroom, removed her clothes, and took a bath. Defendant stood outside the bathroom door and told L.C. not to tell anyone. Before the incident, L.C. had arranged to go shopping with her cousin, Blondale DeMoss. L.C. heard Ms. DeMoss honk her car horn and went outside. L.C. was crying and told Ms. DeMoss that "it hurt." Ms. DeMoss led L.C. back into the house and examined L.C.'s vaginal area in L.C.'s bedroom. L.C. left with Ms. DeMoss, and the two women tried to find L.C.'s mother. When they could not locate Ms. Smith, Ms. DeMoss drove L.C. to the emergency room.

L.C. said that the hospital staff gave her medication which made her sleepy. The hospital staff also performed a rape kit. L.C. remembered talking with Sergeant Larry Brown at the hospital and telling him what she had been wearing when the incident occurred.

On cross-examination, L.C. said that her uncle and his friend, Roderick Diggens, returned to the residence

right after Ms. DeMoss arrived. L.C. said she did not tell Mr. Clark about the incident. L.C. acknowledged that she did not call 911 because her cousin had arrived. L.C. denied having any trouble with Defendant in the past but acknowledged that her brother, Lavonta Cook, had previously had physical altercations with Defendant.

Dr. Mike Ravelle was the attending physician at the Jackson-Madison County General Hospital's emergency room when L.C. arrived. Dr. Revelle testified that L.C. was very upset, and she did not want to be examined or questioned about the incident. Dr. Ravelle told L.C. that he needed to know what had happened in order to treat her properly. L.C. reported that Defendant began touching her inappropriately while she was sleeping on the couch, and then attempted to penetrate her vaginally with his penis. Dr. Ravelle said that L.C. told him that she tried to fight off Defendant, but that Defendant bit her in the vaginal area. L.C. said that she had taken a bath and changed clothes before coming to the emergency room.

Dr. Ravelle said that it was necessary to sedate L.C. in order to perform a rape kit. A blood sample and vaginal swab were taken. Dr. Ravelle said that there was almost no chance of finding any evidence because L.C. had bathed immediately after the incident, and Defendant had not ejaculated. Dr. Ravelle said that L.C.'s physical examination revealed a great deal of swelling in the vaginal area. Dr. Ravelle did not notice any teeth marks but stated that the redness and swelling were consistent with some type of pinching or biting.

Phyllis Taylor, a nurse with the hospital, testified that L.C. was very tearful and anxious when she arrived at the emergency room, and a sedative was administered in order for the doctor to perform an examination. Ms. Taylor examined L.C.'s external vaginal area. She described the area as very swollen and red, and she noted an abrasion. Ms. Taylor said the physical examination was consistent with L.C.'s description of the sexual assault.

Larry Brown testified that he was a sergeant with the Madison County Sheriff's Department at the time of the incident. Sergeant Brown spoke with L.C. briefly in the hospital but could not take her statement because L.C. had been sedated. Sergeant Brown took custody of

the rape kit which was subsequently sent to the T.B.I. for analysis.

Sergeant Brown went to L.C.'s residence, but no one was home. He located Ms. Smith and accompanied her back to the residence. Ms. Smith gave her consent for Sergeant Brown to take the clothes that L .C. had been wearing at the time of the incident. Ms. Smith had not seen Defendant before she left for work that day, but she allowed Sergeant Brown to take the pair of blue jeans Defendant had been wearing the last time Ms. Smith saw him.

Sergeant Brown said that he could not locate Defendant that weekend. On Monday morning, July 5, 2005, Sergeant Brown received a telephone call from Defendant's sister informing him that she would be bringing Defendant to the sheriff's department. When he arrived, Sergeant Brown read Defendant his *Miranda* rights, and Defendant signed a waiver of those rights. The department's nurse took a sample of Defendant's blood. Sergeant Brown stated that Defendant had a laceration on the inside of his right upper lip, a scratch on his left check, and some ointment on a scratch on his right shoulder.

On cross-examination, Sergeant Brown acknowledged that Defendant was cooperative during the interview and offered no resistance to being examined or offering a blood sample. Defendant gave a statement denying that he had committed the offense.

Agent Donna Nelson, a forensic scientist with the T.B.I., performed a DNA analysis on the clothing samples provided by the sheriff's department. Agent Nelson said that no trace of semen was found on the victim's clothing. Agent Nelson detected blood on Defendant's blue jeans, but the sample was too small or too degraded for DNA testing. On cross-examination, Agent Nelson acknowledged that she did not test for the presence of saliva because the victim had bathed immediately after the offense.

Blondale DeMoss testified that she spoke with L.C. by telephone on July 2, 2005, and arranged to pick L.C. up for a shopping trip. Ms. DeMoss said that she stopped at a gasoline station and arrived at L.C.'s house about fifteen or twenty minutes after the call. Ms. DeMoss said that she did not have cell phone service while she

was at the gas station but noted that she had missed two calls from L.C.'s phone number during that twenty-minute interval.

When Ms. DeMoss arrived at L.C.'s house, L.C. was crying and upset. Ms. DeMoss repeatedly asked L.C. what was wrong. L.C. finally told Ms. DeMoss that "it hurt" and pointed to her vaginal area. Ms. DeMoss accompanied L.C. to her bedroom. Defendant was sitting at the kitchen table. L.C. laid down on her bed and removed her shorts and underwear. Ms. DeMoss said that L.C.'s vaginal area was swollen and she was bleeding. Ms. DeMoss and L.C. left the residence and tried unsuccessfully to find Ms. Smith. Ms. DeMoss then drove L.C. to the emergency room. Ms. DeMoss said that L.C. was very upset and had to be held down during the examination.

Ms. DeMoss said that she did not say anything to Defendant. Defendant, however, told Ms. DeMoss as she was leaving with L.C., that Ms. DeMoss could take L.C. "wherever you want." Defendant told Ms. DeMoss that he had not touched L.C. On cross-examination Ms. DeMoss acknowledged that L.C. had not told her that Mr. Clark had been in the residence earlier that day.

Defendant testified on his own behalf and denied committing the offense. Defendant stated that Roderic Diggens dropped him off at the residence at approximately 1:00 p.m. when his shift was over. Defendant said that he did not know L.C. was in the house. Mr. Clark left with Mr. Diggens to purchase some beer. Defendant said that he did not see L.C. until after he had taken a bath. Defendant denied that he spoke with L.C. that afternoon.

Defendant said that L.C.'s brother arrived at the residence about five minutes after Ms. DeMoss and L.C. had left. Mr. Clark told Defendant that Mr. Cook was armed. Defendant went into the bedroom and locked the door. Defendant said that Mr. Cook started beating on the bedroom door, and Defendant ran into the bathroom and climbed out the window. Defendant tried to run away but became winded. Mr. Cook caught up with him and kicked Defendant in the mouth with his shoe. Defendant said that he told Sergeant Brown about his encounter with Mr. Cook, and Sergeant Brown took notes about the incident.

Defendant said that he agreed to submit to any type of testing because he did not have anything to hide. Although not entirely clear from the transcript, Defendant said that he waited until Monday to turn himself in because he was waiting on his paycheck.

On cross-examination, Defendant said that he noticed L.C. on the couch when he opened the front door. Defendant said he sat at the kitchen table. Defendant did not notice if L.C. was crying, and he did not see Ms. DeMoss go with L.C. into L.C.'s bedroom. Defendant said that Ms. DeMoss pointed a knife at him as she was leaving with L.C. and asked him what had he done to L.C. Defendant told Ms. DeMoss that he had not done anything. Defendant agreed that he had no reason to doubt Dr. Revelle's and Ms. Taylor's testimony about the results of L.C.'s physical examination.

Defendant insisted that the injuries on his face were inflicted by Mr. Cook. Defendant said when Mr. Cook stopped hitting him, he said, "I told her I was gonna kill you." Defendant said that Mr. Cook shot at the bedroom door, and Defendant saw the bullets pierce the wood.

Sergeant Brown testified that he followed up on Defendant's report of Mr. Cook's assault. Sergeant Brown said that there were no bullet holes in the bedroom door. Sergeant Brown stated that he observed an open bedroom window on his first trip to L.C.'s residence. On cross-examination, Sergeant Brown agreed that this was the first time that he heard about Ms. DeMoss pointing a knife at Defendant. Defendant's statement did not mention this fact. Sergeant Brown said he went over the statement with Defendant three times to make sure it was correct.

State v. Smith, 2007 WL 3132938, at *1-4.

## B. Procedural History of Smith's § 2254 Petition

On June 24, 2010, Smith filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, accompanied by a legal memorandum. (D.E. 1; D.E. 1-1.) Smith paid the habeas filing fee. (D.E. 2.) The Court issued an order on July 19, 2010, directing

Respondent to file the state-court record and a response to the petition. (D.E. 3.) Respondent filed the state-court record on September 21, 2010 (D.E. 9), and he filed his Answer to Petition for Writ of Habeas Corpus on September 22, 2010 (D.E. 10). Petitioner filed his Traverse to the Respondent's Answer ("Reply") on April 21, 2011. (D.E. 14.)[1]

On May 8, 2013, Respondent filed a Motion to Construe Answer as Motion for Summary Judgment. (D.E. 16.) On May 21, 2013, Petitioner filed an objection to the Respondent's motion. (D.E. 17.) The warden's motion is not accompanied by a legal memorandum and does not itemize the material facts that it contends are undisputed, as required by Local Rules 7.2(a)(1) and 56.1(a). It also does not adequately state why a summary judgment motion is appropriate in this case, how the Court is to apply the summary judgment standard without a statement of undisputed facts, and how the summary judgment standard differs from the review conducted by the Court under Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("§ 2254 Rules") upon receipt of the answer, reply, and state-court record. Because these procedural issues can be avoided by assessing Petitioner's claims under Rule 8(a), Respondent's motion is DENIED as unnecessary.

## II.    PETITIONER'S FEDERAL HABEAS CLAIMS

---

[1]    In an order issued on July 5, 2011, the Court stated that Petitioner's Reply is timely. (D.E. 15.)

In his federal habeas petition, Smith raises the following issues:

1.  Whether the evidence is insufficient to prove beyond a reasonable doubt that Petitioner committed aggravated sexual battery against the victim;

2.  Whether the trial court improperly applied enhancement factors to his sentence and failed to apply any mitigating factors and increased his sentence beyond the statutory maximum to a length of twelve years; and

3.  Whether counsel was ineffective for failing to investigate and present a defense and present certain witnesses.

(D.E. 1 at 5-9; D.E. 1-1.)

III.    **THE LEGAL STANDARD**

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

   **A.    Waiver and Procedural Default**

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state

courts. <u>Cullen v. Pinholster</u>, \_\_\_ U.S. \_\_\_, 131 S. Ct. 1388, 1398, 79 L. Ed. 2d 557 (2011), *reh'g denied*, \_\_\_ U.S. \_\_\_, 131 S. Ct. 2951, 180 L. Ed. 2d 239 (May 31, 2011). The petitioner must "fairly present"[2] each claim to all levels of state-court review, up to and including the state's highest court on discretionary review, <u>Baldwin v. Reese</u>, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 847–48, 119 S. Ct. 1728, 1733–34, 144 L. Ed. 2d 1 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." <u>Adams v. Holland</u>, 330 F.3d 398, 402 (6th Cir. 2003), *cert. denied*, 541 U.S. 956, 124 S. Ct. 1654, 158 L. Ed. 2d 392 (2004); *see also* <u>Smith v. Morgan</u>, 371 F. App'x 575, 579 (6th Cir. 2010)(the <u>Adams</u> holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court which recognizes the court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

---

[2] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982)(per curiam). Nor is it enough to make a general appeal to a broad constitutional guarantee. <u>Gray v. Netherland</u>, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996), *reh'g denied*, 519 U.S. 1157, 117 S. Ct. 1102, 137 L. Ed. 2d 234 (Aug. 27, 1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See* Edwards v. Carpenter, 529 U.S. 446, 452–53, 120 S. Ct. 1587, 1592, 146 L. Ed. 2d 518 (2000)(noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87–88, 97 S. Ct. 2497, 2506–07, 52 L. Ed. 2d 594 (1977), *reh'g denied*, 434 U.S. 880, 98 S. Ct. 241, 54 L. Ed. 2d 163 (Oct. 3, 1977); *see also* Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991)(a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"), *reh'g denied*, 501 U.S. 1277, 112 S. Ct. 27, 115 L. Ed. 2d 1109 (Sept. 13, 1991). If a claim has never been presented to the state courts, but a state-court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 732, 111 S. Ct. at 2555; *see also* Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004)(the procedural default doctrine prevents circumvention of the exhaustion

doctrine), *cert. denied*, 544 U.S. 928, 125 S. Ct. 1653, 161 L. Ed. 2d 490 (2005).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. <u>Schlup v. Delo</u>, 513 U.S. 298, 322, 115 S. Ct. 851, 864, 130 L. Ed. 2d 808 (1995); <u>Coleman</u>, 501 U.S. at 750, 111 S. Ct. at 2565. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. <u>Schlup</u>, 513 U.S. at 321, 115 S. Ct. at 864; *see also* <u>House v. Bell</u>, 547 U.S. 518, 536-39, 126 S. Ct. 2064, 2076-78, 165 L. Ed. 2d 1 (2006)(restating the ways to overcome procedural default and further explaining the actual innocence exception).

**B.   Merits Review**

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1398 (internal quotation marks and citations omitted).[3]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the United States Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).[4] An "unreasonable application" of federal law occurs when the state court "identifies the correct

---

[3] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007), *reh'g denied*, 551 U.S. 1177, 128 S. Ct. 7, 168 L. Ed. 2d 784 (July 30, 2007).

[4] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002)(per curiam), *reh'g denied*, 537 U.S. 1148, 123 S. Ct. 955, 154 L. Ed. 2d 854 (Jan. 13, 2003); *see also* <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003); <u>Treesh v. Bagley</u>, 612 F.3d 424, 429 (6th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S. Ct. 1678, 179 L. Ed. 2d 622 (2011).

governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>  The state court's application of clearly established federal law must be "objectively unreasonable." <u>Id.</u> at 409, 120 S. Ct. at 1521.  The writ may not issue merely because the habeas court, in its independent judgment, determines that the state-court decision applied clearly established federal law erroneously or incorrectly.  <u>Renico v. Lett</u>, ___ U.S. ___, ___, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010); <u>Williams</u>, 529 U.S. at 411, 129 S. Ct. at 1522.

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts."  However, in <u>Wood v. Allen</u>, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010), *reh'g denied*, 559 U.S. 1032, 130 S. Ct. 1942, 176 L. Ed. 2d 405 (Mar. 22, 2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.  In <u>Rice v. Collins</u>, 546 U.S. 333, 341–42, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas

review that does not suffice to supersede the trial court's . . . determination."[5]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" Harris v. Haeberlin, 526 F.3d 903, 910 (6th Cir. 2008)(quoting Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005)), *reh'g and reh'g en banc denied* (Aug. 14, 2008). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003). A state-court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding. Ayers v. Hudson, 623 F.3d 301, 308 (6th Cir. 2010), *reh'g and reh'g en banc denied* (Dec. 28, 2010); *see also* Hudson v. Lafler, 421 F. App'x 619, 624 (6th Cir. 2011)(same), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1085, 181 L. Ed. 2d 803 (2012).

IV.        **ANALYSIS OF PETITIONER'S CLAIMS**

    A.    **Sufficiency of the Evidence (Claim 1)**

---

[5]        In Wood, 558 U.S. at 293, 120 S. Ct. at 845, the United States Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. *Id.* at 301, 120 S. Ct. at 849. In Rice, 546 U.S. at 339, 126 S. Ct. at 974, the Court recognized that it is unsettled whether there are some factual disputes in which § 2254(e)(1) is inapplicable.

15

In his first issue, Smith asserts that the evidence is insufficient to support his conviction for aggravated sexual battery. (D.E. 1 at 5.) According to the inmate, the "[e]vidence at trial contained no physical evidence to corroborate the voctim's [sic] testimony that Petitioner had any contact with her and there was no evidence that any such contact was for the 'purpose of sexual arousal or gratification,['] which is a necessary element of the offense that must be proved beyond a reasonable doubt to be sufficient for due process purposes." (Id. (irregular capitalization omitted); see also D.E. 1-1 at 1-11.) Smith challenged the sufficiency of the evidence on direct appeal, and the Tennessee Court of Criminal Appeals rejected that claim on the merits, stating as follows:

> Defendant argues that the evidence was insufficient to support a finding beyond a reasonable doubt that any sexual assault against L.C. occurred. Alternatively, Defendant argues that there was no evidence that the offense was committed for the purpose of sexual arousal or gratification.

> In reviewing Defendant's challenge to the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914

(Tenn. 1982).  The jury is presumed to have resolved all
conflicts and drawn any reasonable inferences in favor of
the State.  <u>State v. Sheffield</u>, 676 S.W.2d 542, 547
(Tenn. 1984).  Questions concerning the credibility of
witnesses, the weight and value to be given the evidence,
and all factual issues raised by the evidence are
resolved by the trier of fact and not this court.  <u>State
v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).  These rules
are applicable to findings of guilt predicated upon
direct evidence, circumstantial evidence, or a
combination of both direct and circumstantial evidence.
<u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App.
1990).

Defendant was convicted of the offense of aggravated
sexual battery which is defined as the "unlawful sexual
contact with a victim by the defendant or the defendant
by a victim ... when the defendant causes bodily injury
to the victim."  T.C.A. § 39-13-504(a)(2).  "Bodily
injury" includes "a cut, abrasion, bruise, burn or
disfigurement, and physical pain...."  <u>Id.</u> § 39-11-
106(a)(2).  "'Sexual contact' includes the intentional
touching of the victim's ... intimate parts, if that
intentional touching can be reasonably construed as being
for the purpose of sexual arousal or gratification."  <u>Id.</u>
§ 39-13-501(6).  "Intimate parts" includes the victim's
primary genital area.  <u>Id.</u> § 39-13-501(2).  A person
"acts intentionally with respect to the nature of the
conduct or to a result of the conduct when it is the
person's conscious objective or desire to engage in the
conduct or cause the result."  <u>Id.</u> § 39-11-302(a).

Defendant submits that there was no physical
evidence linking him to the commission of the offense,
and the State's case rested solely on L.C.'s testimony
which, Defendant argues, contains sufficient
inconsistencies to cast a reasonable doubt upon his
guilt.  Specifically, Defendant contends that L.C. lied
to Ms. DeMoss when she told Ms. DeMoss during a telephone
conversation before the incident that she was home alone
when, in fact, Mr. Clark was at the house before
Defendant arrived.  Defendant points out that L.C. did
not identify Defendant as the perpetrator until Ms.
DeMoss asked L.C. why she was hurting.  Defendant also
submits that there was evidence that L.C.'s brother had
acted aggressively towards Defendant in the past.

Viewing the evidence in a light most favorable to the State, L.C. testified that she was asleep on the couch when Defendant began inappropriately touching her. L.C. struggled with Defendant. Defendant removed L.C.'s clothes and threw her to the floor. Defendant attempted to penetrate L.C. vaginally with his penis and was successful for a short time. Defendant then began biting L.C. on the vaginal area as she continued to struggle. Both Dr. Ravelle and Ms. Taylor testified that the redness and swelling in L.C.'s vaginal area was consistent with the type of sexual assault described by L.C.

Although Defendant denied committing the offense, any inconsistencies in L.C.'s testimony were obviously resolved in favor of the State in light of the jury's verdict. Indeed, it is well established that the testimony of a victim alone is sufficient to support a conviction. *See* <u>State v. Strickland</u>, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). As noted above, questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See* <u>State v. Evans</u>, 108 S.W.3d 231, 236 (Tenn. Crim. App. 2003). Therefore we conclude that the victim's testimony alone was sufficient evidence for a jury to find the Defendant guilty of the offense with which he was charged[.]

Defendant argues that the evidence supports a finding that the offense was "a violent attack motivated by a history of humiliation and violence suffered by [Defendant] at the hands of [the victim's] family members," and not for the purpose of sexual arousal or gratification. L.C.'s testimony concerning Defendant's relationship with her family was vague and somewhat inconsistent. L.C. first said that she had "maybe" had trouble with Defendant before the incident, and then she denied that she had ever had any problems with him. L.C. said that "probably" her brother or some other family member had struck Defendant in the past, but she had never witnessed such conduct. L.C. then denied that anyone "picked on" Defendant.

Nonetheless, viewing the evidence in favor of the State, Defendant was left alone with L.C. when Mr. Clark and Mr. Diggens went to the store. L.C. was asleep when

Defendant initiated the inappropriate contact. Defendant removed all of L.C.'s clothes and told her that he would not do anything that would make her pregnant. When he was unable to sustain penile penetration, Defendant began biting L.C. in the vaginal area. Defendant stood outside the bathroom while L.C. bathed and told L.C. not to tell anyone about the incident.

Based on the foregoing, we conclude that the jury could reasonably find that Defendant intentionally penetrated L.C. vaginally with his penis and touched her on her vaginal area with his mouth, for the purpose of sexual arousal or gratification. *See* State v. Hayes, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) (noting that intent in sexual battery cases is often proved by circumstantial evidence, including conditions under which the touching occurred); *see also* State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) ("We recognize that jurors may use their common knowledge and experience in making reasonable inferences from evidence."). Finally, we note that the statute only requires an intentional touching that can be "*reasonably construed* as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (emphasis added); *see also* State v. Wesley Earl Brown, No. M2003-02804-CCA-R3-CD, 2005 WL 1412088, *6 (Tenn. Crim. App., at Nashville, June 16, 2005), *perm. to appeal denied* (Tenn. Dec. 5, 2005) (citing State v. Roy Chisenhall, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at *3 (Tenn. Crim. App., at Nashville, June 3, 2004). Thus, we conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of aggravated sexual battery. Defendant is not entitled to relief on this issue.

State v. Smith, 2007 WL 3132938, at *4–6.

In Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791–92, 61 L. Ed. 2d 560 (1979), the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 — if the settled procedural prerequisites for such a claim have otherwise been satisfied — the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced

at the trial no rational trier of fact could have found proof beyond a reasonable doubt." This standard requires a federal district court to examine the evidence in the light most favorable to the State. Id. at 326, 99 S. Ct. at 2793 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"). The State is not required "to rule out every hypothesis except that of guilt beyond a reasonable doubt[.]" Id. at 326, 99 S. Ct. at 2792.

"[A] federal court may not overturn a state curt decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court may do so only if the state court decision was objectively unreasonable." Cavazos v. Smith, ___ U.S. ___, 132 S. Ct. 2, 3, 181 L. Ed. 2d 311 (2011)(per curiam)(internal quotation marks & citation omitted), *reh'g denied,* ___ U.S. ___, 132 S. Ct. 1077, 181 L. Ed. 2d 794 (Jan. 9, 2012).

Because the Petition does not address the standards for evaluating habeas claims on the merits, it is unclear whether Smith contends that the decision of the Tennessee Court of Criminal Appeals on this issue was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by

the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding," id. § 2254(d)(2).

Petitioner has not argued that the decision of the Tennessee Court of Criminal Appeals was contrary to Jackson v. Virginia. This is "a run-of-the-mill state-court decision applying the correct legal rule from [Jackson] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406, 120 S. Ct. at 1520.[6]

Smith also has failed to satisfy his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Jackson v. Virginia or that it was based on an unreasonable determination of the facts. His presentation of this issue in his legal memorandum is substantially similar to his brief to the Tennessee Court of Criminal Appeals on direct appeal. Smith reiterates the arguments he presented to the Court of Criminal Appeals that the proof that he had physical contact with the victim was insufficient and that any contact was

---

[6]     The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406, 120 S. Ct. at 1520; see also id. at 407, 120 S. Ct. at 1520 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

not shown to be for the purpose of sexual arousal and gratification. (*See* D.E. 1 at 5; D.E. 1-1 at 1-11.) He fails to address the decision of the Tennessee Court of Appeals and, consequently, fails to identify any defect in the state court's reasoning. In his Reply, the inmate asserts that "[t]he State court's conclusions that the evidence was sufficient to prove beyond a reasonable doubt that Petitioner was guilty of every essential element of aggravated sexual battery was based upon an unreasonable application of <u>Jackson v. Virginia</u>, and was based upon an unreasonable determination of the facts in light of the evidence presented in state court." (D.E. 14 at 4.) Despite his recitation of the statutory standard, Smith fails to address the analysis of the Tennessee Court of Criminal Appeals and the evidence on which it relied and, instead, selectively picks the evidence that supports his arguments.

At trial, the victim, "L.C.," testified that she lived with her mother; her stepfather, Gregory Smith; her brother; and her uncle, Willie Clark. (D.E. 9-2 at 14-15.) During the early afternoon of July 2, 2005, L.C. was at home alone with her uncle. (<u>Id.</u> at 16.) L.C. was "lying on the couch asleep." (<u>Id.</u>) At some point, Smith came home and Willie Clark left for the store. (<u>Id.</u> at 16-17.)

L.C. testified that "I was laying on the living room couch asleep, and I heard Gregory ask me for the phone and I didn't say

anything." (<u>Id.</u> at 18.) Smith was looking in the victim's room for the telephone. (<u>Id.</u>) Smith then "came to the couch where [the victim] was lying." (<u>Id.</u>) The victim was dressed in "[b]lue jean shorts and a sleeveless white shirt" and underwear. (<u>Id.</u> at 19.) L.C. testified that Smith "started touching me . . . [b]elow the waist part." (<u>Id.</u>) He touched the victim's vaginal area. (<u>Id.</u>) L.C. testified that "I asked him what was he doing," but "[h]e didn't say nothing" and he did not stop. (<u>Id.</u> at 20.) Instead, the victim testified that "[h]e tried to unbutton my pants, and that's when I started fighting him off of me." (<u>Id.</u>) L.C. stated that "I was trying to kick him in his face," and she did make contact with Smith. (<u>Id.</u>) He did not stop (<u>id.</u> at 20–21), and he was able to remove the victim's pants (<u>id.</u> at 21). The victim testified that, once Smith got her pants off, "[h]e threw me on the floor, and that's when he started shoving his penis into me, and I was still trying to fight him off of me, and then he had stopped and he started biting me." (<u>Id.</u>) The victim clarified that "[w]hen he got me on the floor, he threw my clothes onto the couch, and then that's when he started shoving his penis into me . . . ." (<u>Id.</u> at 22.) She also testified as follows:

Q.   . . . [W]hat was he shoving his penis into?

A.   Into my vagina.

Q.   Did it ever go in?

A.   Yes.

Q. How long was it in?

A. It wasn't long.

Q. Do you know what I mean when I use the term ejaculate?

A. Yes.

Q. Do you know whether or not he ejaculated?

A. He did not.

(Id. at 23.) While Smith was attempting to penetrate her, the victim testified that "[h]e was saying that he wasn't going to make me have a baby and I wasn't going to have a baby and that was it." (Id. at 30.)

The victim also testified that "[a]s soon as he stopped shoving his penis into my vagina, he started biting me . . . [o]n my private part, on my vagina." (Id. at 24.) L.C. testified that she was resisting during the assault. (Id.) According to "L.C.," "I was trying to get up and like run from him or whatever, but every time I moved, he moved. His mouth was like — It was like his mouth was attached to me." (Id.) In response to how long that went on, the victim responded, "It wasn't long. It wasn't a very long time." (Id.) At some point, "[h]e just stopped." (Id.)

When the assault ended, L.C. went into the bathroom and took a bath. (Id. at 25.) While the victim was in the bathroom, Smith "was telling me not to tell no one." (Id. at 30-31.) L.C. was expecting her cousin, Blondale DeMoss, and when DeMoss blew her

horn, the victim went outside to meet her. (<u>Id.</u>) The victim testified that

> I went outside and I was crying, and she was asking me what was wrong with me or whatever, and the only thing I could say was, "It hurt," and she was like, "What hurt," and she took me into my bedroom and she looked at my private area, and that's when she asked the Defendant Gregory Smith what did he do to me, and he didn't say anything.

(<u>Id.</u> at 26–27.) The victim then testified that "after she had looked at me, she asked Gregory Smith what did he do to me, and he said he didn't do anything to me. He said I just started acting like that when he got there." (<u>Id.</u> at 27–28.) DeMoss took the victim to her mother's workplace but she was not there. (<u>Id.</u> at 28.) DeMoss then took the victim to the emergency room. (<u>Id.</u>) The victim was asked to describe her emotional state once she got to the hospital, and she responded, "I was in pain." (<u>Id.</u>) L.C. stated that her vagina hurt. (<u>Id.</u> at 29.) She recalled that she was unable to allow herself to be examined until she was sedated. (<u>Id.</u>)

On cross-examination, the victim testified that she was fourteen years old when the incident occurred. (<u>Id.</u> at 31.) Willie Clark was not babysitting the victim, but he was at the house with her on July 2, 2005. (<u>Id.</u> at 31–32.) When Smith arrived home, Clark left to go to the store. (<u>Id.</u> at 33.) He was gone for approximately thirty minutes. (<u>Id.</u> at 33–34.)

Clark returned home with Roderick Diggens. (<u>Id.</u> at 34.) At that time, Smith was sitting at the kitchen table. (<u>Id.</u>) The victim did not tell Clark and Diggens what Smith had done to her. (<u>Id.</u> at 34, 40.) When asked why she did not tell, she stated, "'Cause when they got there my cousin was outside." (<u>Id.</u> at 35.)

Defense counsel asked the victim why she did not call 911, and she stated "'Cause my cousin was outside." (<u>Id.</u>) She also testified that "after it had happened and I went to the restroom to wash myself up, my cousin was outside, so I told my cousin." (<u>Id.</u> at 36.) DeMoss was twenty-one years old. (<u>Id.</u>) The victim was aware that 911 is to be used in emergency situations. (<u>Id.</u> at 36–37.) She felt that her situation was an emergency. (<u>Id.</u> at 37.) The victim reiterated that she did not call 911 because her cousin was outside when she was done in the bathroom. (<u>Id.</u>)

Defense counsel questioned the victim about whether Smith ever penetrated her.

> Q. . . . . [Y]ou stated that Mr. Smith raped you, correct?
>
> A. Yes.
>
> Q. And that he was trying to penetrate you; is that correct? Sexually penetrate you?
>
> A. I don't know what that means.
>
> Q. He was trying to insert his penis into your vagina.
>
> A. Yes.

Q.  And is it your testimony that he accomplished that?

A.  Yes.

(Id.)  On further questioning, L.C. testified that she did not know if Smith had any body hair (id. at 37-38) and that her body hair did not touch Smith's body hair (id. at 38).  She was asked how she knew their hair did not touch, and she explained:

> Because when I was lying on the floor and Gregory was trying — when Gregory was shoving his penis into me, he was holding it.  So he was like holding it and like shoving it into me.  While my legs was up in the air, he was holding it and shoving it into me. . . .

(Id.)  L.C. also testified that Smith did not have an erection. (Id.)

The victim denied that she spoke about the case with her brother, Lavonta Cook.  (Id. at 43-44.)  In response to whether she and her brother had ever had trouble with Smith, L.C. first stated "no" and then said, "I'll say in the past, yeah, maybe."  (Id. at 44.)  In response to what type of trouble she had had with Smith, the victim testified that "I ain't never had any trouble with Mr. Gregory Smith."  (Id.)  She denied that she had ever seen her brother or any relative hit Smith, but the victim stated that "it probably happened before."  (Id. at 45.)  The victim denied that anybody picked on Smith.  (Id.)  She also testified that she was "fine" with Smith as her stepfather.  (Id. at 46.)

On redirect, the victim testified that Smith was in the hallway while she was in the bathroom after the assault.  (Id. at

47.) She clarified that she was not "fine" with what Smith had done to her that day. (Id.) The victim also testified that her uncle and Diggens were not in the house when DeMoss arrived and blew her horn. (Id. at 46-47.) According to the victim, "When my cousin blew the horn, it wasn't nobody there but me and Gregory at the time. As soon as I had went outside, that's when Rod and my Uncle Will had pulled up." (Id. at 48.) They arrived when the victim and DeMoss were going back into the house. (Id.) L.C. also testified that she did not know what to do when the assault happened and that not many people lived near her. (Id. at 51.)

Dr. Mike Revelle, the physician in the emergency room at Jackson-Madison County General Hospital, testified that the victim "came to the emergency room through the triage complaining of having possibly been raped. She was subsequently brought back to an exam room where [Revelle] went in and discussed with her what had happened that day." (Id. at 55.) Revelle testified that the victim "was obviously very upset, very tearful. She did not want to be examined, really didn't want to be questioned much about the incident at all. Obviously something traumatic had happened to her based on her being very upset." (Id.) Revelle recalled that the victim

> said that she was lying on the couch and Mr. Smith came
> in and began to touch her in an inappropriate way. She
> woke up and asked him to stop, and it eventually
> proceeded to him removing her clothes and attempting
> vaginal penetration with his penis. She said she fought
> him off. Ultimately apparently she described him biting

> her in the vaginal area. Was able to eventually fight
> him off, get him to stop, and then he left. Was not sure
> if he ejaculated or not. Did not think he wore a condom.
> That's basically what I remember at this point.

(<u>Id.</u> at 56-57.) The medical records reflect that "'Patient was asleep when the stepfather began to touch her when she kicked him. She was thrown from the couch to the floor. Penile penetration of the vagina. Stepfather began to bite her. She bathed her privates. She changed her clothes, and her cousin brought her to the ER.'" (<u>Id.</u> at 63.) The medical records state that the assault occurred at 2:00 p.m., and Revelle saw the victim at 4:00. (<u>Id.</u> at 58-59.) Revelle recalled that the victim "indicated that she had gone and taken a bath and cleaned and changed clothes prior to the emergency room." (<u>Id.</u> at 59.)

Revelle and a nurse performed a rape kit, which included a blood sample, a vaginal swab, and pubic hair combing. (<u>Id.</u> at 59-60.) Revelle explained that "[w]e're looking to try to collect semen or any other DNA evidence that does not belong to the patient themselves, maybe belonging to the assailant, along with a thorough vaginal and/or any other area that may be described as being traumatized during the alleged rape." (<u>Id.</u> at 60.) Emergency room staff also collects a victim's undergarments "regardless if they're the undergarments being worn at the time." (<u>Id.</u> at 60-61.) Before performing the rape kit, L.C. had to be sedated. Revelle testified that "[s]he was very upset, obviously did not want anybody touching her in the vaginal area, and so we ultimately had to give her some

sedation so that we could perform an adequate rape kit." (<u>Id.</u> at
64.) Revell said that "I took a history before we sedated her."
(<u>Id.</u>)

Revelle was qualified as an expert in emergency medicine and
in medicine in general. (<u>Id.</u> at 59-60.) He was asked the
likelihood that an examination would find semen where "a victim is
raped and there's a very brief amount of penetration, no
ejaculation, the victim washes and cleans up," and he responded,
"Very little likelihood, almost — I mean, if the assailant did not
ejaculate, there's very, very near zero percent chance of finding
anything on the rape kit." (<u>Id.</u> at 65.) Revelle testified that
they nevertheless did a rape kit "because it's not 100 percent, and
therefore we try to find all the evidence we can." (<u>Id.</u> at 66.)
Revelle also testified that the victim's demeanor was consistent
with that of an assault victim, specifically "[t]he fact that she
was very upset, emotionally distraught, did not want anyone to
examine or touch her in that area is all consistent with someone
having gone through a very emotionally difficult process." (<u>Id.</u>)

Revelle also testified to the results of his vaginal
examination of L.C. He stated:

> She did have quite a bit of swelling anterior and lateral
> to the left side of the clitoral hood. There were no
> obvious marks, and I know the testimony of [the victim]
> is that she had been bitten there, but this trauma would
> be consistent with some type of pinching or certainly
> biting. There were no teeth marks, but certainly there
> had been some obvious trauma there. The vaginal trois
> didn't have any obvious damage, broken skin but was very

swollen and tender to touch, indicating that there had been some sexual encounter recently.

(<u>Id.</u> at 67.) Revelle was asked why the trauma he observed was not an obvious bite mark, and he responded, "There were no teeth marks. I mean, there was nothing that would lead you to believe that there had actually been penetration of the skin with the teeth." (<u>Id.</u> at 68.) He confirmed that the marks he observed were consistent with bite marks. (<u>Id.</u>) Revelle also stated that the victim's injuries and her demeanor were "consistent with her being a victim" of sexual assault. (<u>Id.</u> at 68–69.)

On cross-examination, Revelle testified that the rape kit found no DNA that matched Smith. (<u>Id.</u> at 71.) He also related that, to his knowledge, no physical evidence was found that connected Smith to the rape charge. (<u>Id.</u> at 71–72.) Revelle did not examine Smith. (<u>Id.</u> at 72.)

On redirect examination, Revelle testified that he would not expect to find DNA evidence in a situation such as that described by the victim. (<u>Id.</u>)

The next witness, Phyllis Taylor, was a nurse practitioner at the Jackson-Madison County General Hospital emergency room. (<u>Id.</u> at 72–73.) Taylor had been practicing in the field of nursing for twenty-four years and had been a nurse practitioner "[a]bout six" years. (<u>Id.</u> at 74.) She had undergone Sexual Abuse Nurse Examiner ("SANE") training, which is intended "to identify victims of sexual abuse and to be able to identify anatomy, write down and obtain any

items that might be necessary for the victim." (<u>Id.</u> at 75.)
Taylor had also been trained in evidence collection and had seen
hundreds of cases since July of 2005. (<u>Id.</u> at 75-76.)

Taylor recalled treating L.C. on July 2, 2005. She stated
that "I didn't remember her name, but I do remember her case."
(<u>Id.</u> at 76.) She was asked whether there was anything about the
victim's case that distinguished it from other cases she had seen,
and she responded, "She struggled, and that doesn't usually
happen." (<u>Id.</u>) Taylor also recalled that the victim "was very
anxious and tearful, crying." (<u>Id.</u> at 78.) In order to examine
the victim, it was necessary to do a conscious sedation, which
means that "[t]hey put in an IV and gave her medicine to sedate
her." (<u>Id.</u>)

Before sedating the victim, Taylor assisted in interviewing
her about what had happened. (<u>Id.</u>) She testified as follows:

    Q.    Do your notes reflect what she indicated to you
    had happened to her?

    A.    Yes.

    Q.    And what did she tell you?

    A.    She said she was lying on the couch and that a
    man started kissing her and touching her privates, and
    she kicked him on the left side of his face with her bare
    foot.

    Q.    Did she indicate who that man was? Did she
    identify him?

    A.    Her stepfather.

32

Q.   Did she indicate what happened to her after she kicked him in the right side of his face?

A.   He threw her to the floor, unbuttoned her clothes and stuck his thing on her cooch.

Q.   And the word —

A.   That's her private. Yeah, that's her exact words.

Q.   Those are her words?

A.   Yes, those are her words.

Q.   And after she indicated that he did this to her, what did she say he did at that point?

A.   He bit her; he bit her private.

Q.   And go on.  What do your notes reflect she told you?

A.   She says that after the assault, she was swollen and she was bleeding, so she took a bath and changed her clothes.

(Id. at 79-80.)

Taylor examined the victim's external vaginal area, and she stated that the victim "was very swollen, reddened, there was some vaginal drainage and there was an abrasion."  (Id. at 80.)  The injuries Taylor observed were consistent with a sexual assault. (Id.)

On cross-examination, Taylor related that she was not familiar with the victim's living arrangements.  (Id. at 81.)  She also did not know the results of the victim's rape kit test.  (Id. at 82.)

At the time of the events at issue, Larry Brown was a Sergeant with the Madison County Sheriff's Department.  (Id. at 82.)  On

33

July 2, 2005, he was assigned to the violent crimes division with responsibility for cases involving children. (Id. at 83.)

Brown recalled responding to a call from the Jackson-Madison County General Hospital emergency room on July 2, 2005. (Id. at 84.) He was the investigator on call that day. (Id.) The Sergeant "was advised that there was a juvenile female who had arrived at the ER by family transport and that she said she'd been raped." (Id.) Brown testified that, "[w]hen I arrived at the ER, [the victim] had already been given a sedative. I was able to speak with her briefly as she was going in and out of consciousness." (Id. at 85.) The victim told Brown "basically the preliminary portions of what happened," but "[a]t that point [he] could not take a statement from her." (Id.)

The officer testified that he left the hospital when the victim was completely sedated and the rape kit was finished. (Id. at 86.) Because the assault occurred at the victim's home, he attempted to contact the victim's mother to gain access to the residence. (Id.) He went to the residence, but nobody was home. (Id.) Brown arrived at the victim's home "around 4:00 or 4:30." (Id. at 87.) Brown needed access to the victim's home to collect the clothes she had been wearing when she was assaulted. (Id.)

The Sergeant "continued to try to get in touch with the victim's mother and was able to get her later and went back to the residence with her." (Id.) After she went to the hospital, the

victim's mother met Brown at the residence and gave him consent to collect evidence." (Id.) He testified that

> I collected the pair of panties that [the victim] said she was wearing at the time. I collected a shirt. There was a tank top shirt that she was wearing, a pair of jeans, blue jean shorts, and I also asked Ms. Smith what was Mr. Smith wearing the last time she had seen him. She advised he had on a pair of blue jean pants that she believed were hanging on a chair in the bedroom.

(Id. at 88.) Brown recalled that the victim's mother had last seen Smith wearing those pants the day prior to the assault, "because she said he hadn't been at the residence when she left to go to work." (Id.) He collected those items because "we were looking for any evidence of the assault, any semen, any blood, anything that would present or place these two people together." (Id. at 92.) Brown took the clothing and the rape kit to the Tennessee Bureau of Investigation. (Id.)

The officer related that, when he first visited the residence on July 2, 2005, he looked for Smith but nobody appeared to be home and no vehicles were present. (Id. at 93.) Brown noticed that "[t]here was one window that was open on the back side of the residence." (Id.) He could not locate Smith that day, and he "[p]ut out a bulletin to the city, state and the county, anyone having contact with him to take him into custody for questioning." (Id.) Over the weekend, Brown "[c]ontacted family members, tried to make contact with" Smith, but he "couldn't find him." (Id.)

On Monday, July 4, 2005, Brown received a telephone call from Smith's sister advising that "she would be coming down to the office with him, and [Brown] agreed and told her to bring him onto [sic] the office." (Id. at 93-94.) The officer met with Smith, obtained a signed waiver of his rights, and took a blood sample. (Id. at 94.)

The Sergeant noticed that Smith had some facial injuries, which were photographed. (Id. at 95.) Smith had a laceration on the inside of his right upper lip. (Id. at 95-96.) Brown explained that "[t]he victim told me she had kicked him in the face, and I looked under the lip because I figured that if she kicked him in the face, it may have been some damage from his teeth to the inside of his lip." (Id. at 96.) Smith also had a scratch on his left cheek, where "[j]ust the exterior skin [had been] scratched away." (Id. at 96-97.) Smith had some salve or ointment on his right shoulder, and Brown related that he did not know how Smith got that laceration. (Id. at 97.)

On cross-examination, Brown testified that Smith offered no resistance. (Id. at 98.) He read Smith his Miranda rights, and the suspect gave a statement. (Id. at 100-01.) Brown admitted that he found no DNA evidence of the assault. (Id. at 102.) Brown recalled that the victim's mother told him that L.C. was going to be home on July 2, 2005, and that her uncle, Willie Clark, would also be present, but "[n]obody was really looking after her or

baby-sitting her." (<u>Id.</u> at 103.) The Sergeant interviewed the victim's brother, Lavonta Cook but did not do any further investigation after the results of the rape kit were received. (<u>Id.</u> at 103-05.)

On redirect examination, Brown mentioned that he also questioned Blondale DeMoss and spoke with numerous people about the assault. (<u>Id.</u> at 106.) On recross-examination, Brown affirmed that Smith turned himself in on July 4, 2005. (<u>Id.</u> at 107.)

Donna Nelson, a special agent forensic scientist with the Tennessee Bureau of Investigation, analyzes evidence for the presence of sperm, semen, blood, and saliva and, if any substance is present, does a DNA comparison to determine from whom it came. (<u>Id.</u> at 108.) Nelson was qualified as an expert in the area of DNA analysis and evidence retrieval. (<u>Id.</u> at 110-11.) She received the rape kit and clothing that had been collected in the case at issue but she did not find semen on any of the items she analyzed. (<u>Id.</u> at 111-12, 116.) With the exception of the pants belonging to Smith, Nelson also found no blood. (<u>Id.</u>) She was unable to identify the source of the blood on Smith's pants because she "did not get enough sample from the pants to obtain a DNA profile." (<u>Id.</u> at 117.)

On cross-examination, Nelson reiterated that she did not find semen on any of the items and that the only blood found was obtained from Smith's pants. (<u>Id.</u> at 118-24.) Nelson's report

indicated that the blood on Smith's pants was human, but she was unable to obtain a DNA profile for that blood. (Id. at 123.) She explained that "I just did not have enough DNA. There just wasn't enough sample present, or the sample was degraded, and I was unable to obtain a DNA profile." (Id. at 123–24; *see also* Id. at 126 ("There just was not enough blood on the evidence that was submitted.").) Nelson was asked whether there was any match between Smith and the victim, and she responded, "There was no match obtained because there was no profile to compare." (Id. at 124.) Although she knew that the victim alleged that she had been bitten, Nelson did not test for saliva "because the victim had taken a bath prior to the examination." (Id. at 125.) The agent was not provided information about any individual other than the victim and Smith. (Id.) She related that TBI does not analyze hair samples for DNA. (Id. at 125–26.)

On recross-examination, Nelson testified that she obtained Smith's DNA profile from the blood sample he provided. (Id. at 127–28.) She was asked how the DNA on the pants could be "degraded," and she responded, "That could just be if the item had been cleaned or if it was just stored incorrectly. It could have been exposed to the sun for long periods of time. There's just different things that can affect DNA, cause it to degrade." (Id. at 128.)

Nelson was questioned about the likelihood of being able to collect semen if the rapist did not ejaculate and the victim took a bath after the assault, and she stated, "Well there should be no semen present if there was no ejaculation, and with respect to the saliva, if you take a bath and the saliva is external, it's not going to be there when the testing takes place." (<u>Id.</u> at 129.) She concluded that the probability "[s]hould be zero. If there's no ejaculation, there's not going to be any semen." (<u>Id.</u> at 130.) On further redirect examination, Nelson testified that it was possible for there to be a bite mark on the opening to the vagina, but she reiterated that there would be no saliva if the victim had taken a bath. (<u>Id.</u> at 131.)

Blondale DeMoss testified that she was twenty-one years old and was the victim's first cousin. (<u>Id.</u> at 132.) DeMoss and the victim had been close all their lives. (<u>Id.</u>) She had visited L.C. at her home many times. (<u>Id.</u> at 133.)

DeMoss related that she had planned to pick L.C. up on July 2, 2005, to go shopping. (<u>Id.</u>) She and the victim made the plans during a telephone conversation that day. (<u>Id.</u>) After speaking to L.C., DeMoss stopped at a gas station on her way to L.C.'s house. (<u>Id.</u> at 134.) The drive to the victim's house took "[a]bout 15 to 20 minutes." (<u>Id.</u>) During the initial telephone conversation, the victim did not seem to be upset. (<u>Id.</u>)

DeMoss received two telephone calls while on the way to L.C.'s house, but she was unable to answer because her phone had no service. (<u>Id.</u> at 134-35.) Both calls were from the victim's house. (<u>Id.</u> at 134.)

When she arrived, DeMoss blew the horn, but the victim did not respond. (<u>Id.</u> at 136.) She testified, "I blew two more times, and when she still didn't come out, I got out to go knock on the door and she was coming outside." (<u>Id.</u>) DeMoss saw that the victim "was upset and she was crying." (<u>Id.</u>) According to the witness, "When she came out, she was crying. I was standing at the back of my car, and she walked over to me and she hugged me and she was still crying, and I kept asking her what was wrong and she wouldn't say anything." (<u>Id.</u> at 137.) Then, "after about six times of me asking her what was wrong, she started to tell me that it hurt." (<u>Id.</u>) DeMoss

> asked her, "[L.C.], what hurts," and she grabbed her shorts, and I was like — my exact words were, "Is your coochie hurting," and she kept crying, and she was like, "It hurt, it hurt," and I was like, "well come in the house and let me see."

(<u>Id.</u> at 138.) When they entered the house, Smith was sitting at the kitchen table. (<u>Id.</u>) DeMoss and the victim went into the victim's bedroom and shut the door. (<u>Id.</u> at 139.) She examined L.C. and "saw that she was swollen and that she was bleeding," but she could not tell where the blood was coming from. (<u>Id.</u>) The blood was in the victim's vaginal area (<u>id.</u>), and her vaginal area

was swollen (<u>id.</u> at 140).  DeMoss told the victim to get dressed because she was going to take her to the emergency room.  (<u>Id.</u>) DeMoss did not know Rod Diggens.  (<u>Id.</u> at 141.)  As she and the victim were leaving, she saw that somebody was dropping off her uncle, Willie Clark, but she did not stay and talk to him.  (<u>Id.</u>)

DeMoss did not call 911 and, instead, went to look for the victim's mother at her job.  (<u>Id.</u> at 140.)  The victim's mother was not there, and the gates were locked.  (<u>Id.</u> at 142.)  They went to Smith's sister's house, but did not find the victim's mother. (<u>Id.</u>)

DeMoss and L.C. went to the emergency room, but, at first, the hospital staff "would not see her because they said that I was not her parent or guardian."  (<u>Id.</u> at 142–43.)  Staff eventually treated the victim, and DeMoss was with her in the examination room.  (<u>Id.</u> at 143.)  The victim was upset: "[s]he was crying; she didn't want to be touched."  (<u>Id.</u>)  She testified that "[t]hey had to give [L.C.] some medication to put her to sleep," and DeMoss had to hold the victim down when the sedative was administered.  (<u>Id.</u>) She left the room while the physical examination was performed. (<u>Id.</u> at 143–44.)

DeMoss testified that, as they were leaving the house, Smith said, "You could take her wherever you want to take her.  I know I didn't touch her."  (<u>Id.</u> at 144.)  She had not said anything to

41

Smith at the time, and nobody else said anything to him in her presence. (Id.)

On cross examination, DeMoss testified that she did not confront Smith. (Id. at 145.) She told him that she was taking L.C. to the emergency room. (Id.) DeMoss made that statement before she went into the victim's bedroom and, when they left the bedroom, Smith told DeMoss that she could take the victim wherever she wanted to and that he did not touch her. (Id. at 145-46.)

DeMoss stated that she knew Willie Clark and knew that he lived at the victim's house at one time, but did not believe he was living there on July 2, 2005. (Id. at 146.) She saw Willie Clark when she and the victim were leaving but did not know that Willie Clark and the victim had been together at the house that day. (Id. at 146-47.) DeMoss stated, "When I talked to her she said there was nobody there" and "she told me she was the only person in the house." (Id.) The victim did not tell DeMoss that Willie Clark was at the house. (Id. at 147-48.) When she saw Willie Clark arrive, it did not occur to DeMoss to ask L.C. if he had been at the house previously. (Id. at 148.) DeMoss did not know the person with Willie Clark. (Id.) She knew Lavonta Cook, who is her first cousin. (Id. at 149.) DeMoss advised Brown that the victim told her, during their telephone call, that nobody was at home. (Id.)

DeMoss was questioned about why she did not call 911, and she replied, "I didn't think to call 911." (<u>Id.</u> at 148.) She was familiar with the services offered by 911, and she considered the situation to be an emergency. (<u>Id.</u>) It simply did not enter her mind to call 911. (<u>Id.</u>)

On redirect examination, DeMoss testified that, if she had not stopped at the gas station, it would have taken ten or fifteen minutes to drive to the victim's house which was in the country. (<u>Id.</u>)

Smith took the witness stand and related that the victim was his stepdaughter, and understood that he was being charged with aggravated rape (D.E. 9-3 at 8-9). He denied raping L.C., pulling her clothes off, inserting or trying to insert his penis into her vagina, or performing or trying to perform oral sex on her. (<u>Id.</u> at 9.) He denied committing aggravated rape, rape, sexual battery, aggravated sexual battery, or assault. (<u>Id.</u> at 20.)

On the day in question, Smith left work at 1:00, and a friend, Roderick Diggens, drove him home. (<u>Id.</u> at 9-10.) When he arrived, Will Clark was there, but Smith did not see anyone else. (<u>Id.</u> at 10-11.) Diggens came into the house with Smith and sat with him at the kitchen table. (<u>Id.</u> at 11.) Shortly thereafter, Diggens and Will Clark drove to the store to buy some beer. (<u>Id.</u>)

Smith went into the bathroom to take a bath, and when he left the bathroom L.C. was at the house. (<u>Id.</u> at 11-12.) Smith

testified that he did not grab the victim and did not talk to her. (<u>Id.</u> at 12.) They did not have a confrontation about the telephone. Smith explained that "we got two telephones in the house." (<u>Id.</u>) He denied that he tried to rape the victim. (<u>Id.</u> at 12-13.)

Smith was asked why he left the residence that day, and he replied:

> 'Cause Lavonta Cook — I can't say it good, but Lavonta Cook came up — about five minutes after he came to the house, and my — and Will said, "There come Lavonta Cook," and know there was gonna be some trouble, and I went to my bedroom, locked the door, 'cause we got stuff in our bedroom . . . .

(<u>Id.</u> at 13.) Smith testified that Lavonta Cook arrived five minutes after L.C. and DeMoss had left. (<u>Id.</u>) He said that Lavonta Cook assaulted him and related that

> I locked the door 'cause Will had said he had got a gun. I went to the bedroom, locked that door, and then he started beating on that door, and then when he stopped, I went to that bathroom window, and he seen me running, and I was running, and he caught up with me 'cause I can't run too good 'cause I got a bad heart, and then I fell out for a minute, you know. I got sort of winded, and I'm running for a minute, you know, about five or ten seconds that a'way, and so I got winded. So when I was running, he hit me with his tennis shoe in my mouth, and that tennis shoe, you know, — with that tennis shoe, you know, kicked me right there, and, you know, tennis shoe kicked me in my head, and I showed that police where he kicked me in my head.

(<u>Id.</u> at 14.) Smith said that he told Investigator Brown that Lavonta Cook had assaulted him, and Brown wrote that information down with a pencil. (<u>Id.</u> at 14-15.)

Smith recalled that Brown asked him to give a statement. (<u>Id.</u> at 15.) He told Brown that he did not know how to read or write. (<u>Id.</u>) Brown read Smith his rights and told him that he had the right to an attorney. (<u>Id.</u>) The inmate said that he did not need an attorney and that he would "take any kind of test you want me to take. I do anything just to get me out. I do anything you want me to state." (<u>Id.</u> at 15–16.) Smith consented to a DNA test and to having blood drawn. (<u>Id.</u> at 16.) He said that he had nothing to hide and cooperated with the police to the best of his ability. (<u>Id.</u> at 16, 20–21.)

Smith related that Lavonta Cook had assaulted him several times in the past (<u>id.</u> at 16), but the trial judge sustained an objection to that line of questioning (<u>id.</u> at 16–17).

Smith was asked whether there was anything more he could have done to provide the law enforcement officers with information, and he responded, "Yes, sir. I told them that it was three or four days before they went on the scene. It was four days before he went." (<u>Id.</u> at 17.) Smith clarified that it was four days before the police went to talk to Lavonta Cook. (<u>Id.</u> at 18.)

The petitioner did not try to turn himself in earlier "'cause it was on a Sunday" and he did not know the police were looking for him until the police told him. (<u>Id.</u>) He testified that he waited until Monday morning, at which time he went to his sister's house and turned himself in "so she can't get my check." (<u>Id.</u>) He said,

"I get a check every month, and I had to wait 'til Monday morning so she wouldn't get my check, but she got it anyway. She get my check every month to pay the bills. I pay the bills." (<u>Id.</u> at 18-19.) It is unclear whether Smith was referring to his sister or his wife, the victim's mother. He testified, "I pay the bills every month 'cause she hadn't worked but four months in six years." (<u>Id.</u> at 19.) Smith related that Willie Clark had lived at the victim's home for four years but that it was his understanding that Clark did not live there anymore. (<u>Id.</u> at 19-20.)

On cross-examination, Smith agreed that Sergeant Brown treated him fairly and was not rude to him. (<u>Id.</u> at 21-22.)

The inmate stated that he worked on July 2, 2005, cutting a yard and landscaping. (<u>Id.</u> at 22.)[7] Rod Diggens brought Smith home, and Diggens departed with Clark. (<u>Id.</u> at 22-23.) That left Smith and L.C. alone in the house. (<u>Id.</u> at 23.) When he saw L.C., she was lying on the couch. (<u>Id.</u>) It is unclear whether Smith saw her when he walked in the front door or after his bath. (<i>See</i> <u>id.</u> at 23-24.) She was not asleep. (<u>Id.</u> at 24-25.) Smith did not know whether L.C. was acting upset. He said, "I don't know. I didn't pay no attention to her. I just opened the front door and went back to the kitchen table. I had me a beer there from that night before." (<u>Id.</u> at 25.) Smith testified that the telephone

---

[7] Although Smith's testimony is not clear, he seems to be saying that he gave his wife his disability checks and also made money on the side by cutting yards and landscaping. (D.E. 9-3 at 22.)

rang, and L.C. answered it, but he did not hear to whom L.C. was talking. (<u>Id.</u>) It did not seem that L.C. was upset or crying. (<u>Id.</u> at 26.)

Petitioner then recalled that L.C. was not on the couch when he got home, but she was there when he got out of the bath. (<u>Id.</u>) He was asked whether she was upset or crying, and he stated, "I don't know. I didn't hear her. That's what I'm saying." (<u>Id.</u>) If she were, Smith did not notice it. (<u>Id.</u> at 27.) At some point, he went to the kitchen table to drink beer, and L.C. was on the couch. (<u>Id.</u>) He stated that "the front door was open." (<u>Id.</u>)

According to Smith, DeMoss arrived about the same time as Diggens and Willie Clark. (<u>Id.</u>) When DeMoss was about to leave, Diggens and Clark were still there. (<u>Id.</u> at 28.) Smith did not see DeMoss and L.C. go to the victim's bedroom. (<u>Id.</u>) When DeMoss and L.C. were about to leave, DeMoss pulled a knife on Smith and said, "What you do to my niece," and Smith replied, "I ain't done nothing." (<u>Id.</u> at 28-29.) Smith was asked whether he told Sergeant Brown that DeMoss pulled a knife on him, and he first said, "I don't know. I can't remember," but then recalled, "I think I did. I think I did. Yeah, I know I did. I'm sure I did." (<u>Id.</u> at 29.) After she pulled the knife on Smith, DeMoss and the victim left. (<u>Id.</u>)

Smith testified that L.C. was lying when she testified that he touched her, shoved his penis into her, and bit her on the vagina.

47

(Id. at 30.)  She was also untruthfull when she testified that she went into her bedroom.  (Id.)  Smith could not dispute the testimony of the doctors and nurses that they saw injuries on the victim.  (Id. at 30-31.)

The inmate agreed that his testimony was that DeMoss pulled a knife on him, accused him of doing something, and then left with the victim.  (Id. at 31.)  About five minutes later Lavonta Cook arrived with a gun.  (Id.)  Smith went into the bathroom to avoid Cook (id. at 31-32), and "when [Cook] shot through the door, [Smith] went out the window" (id. at 32).  Smith contends that he received the injuries to his face from Cook.  (Id.)  Cook allegedly said, "I told her I was gonna kill you." (Id.)  Smith did not know the reason why Lavonta Cook arrived with a gun.  (Id. at 32-33.)  He saw three bullets come through the bathroom door.  (Id. at 33.)

Petitioner testified that he did not stay at his house that night but fled and called his sister to pick him up.  (Id. at 34.)  He asked her to get his clothes, and she advised that Sergeant Brown was looking for him.  (Id.)  Smith was asked why he waited to turn himself in until his check came, and he seems to explain that he wanted to take his wife's name off the check and put it in his sister's name.  (Id. at 35.)  He also stated that the check had arrived on Friday, July 1, 2005, but "I didn't see it because my wife get it all the time." (Id.)  He did not need the check to make bond because Smith's sister did so.

Smith was previously convicted of aggravated burglary. (Id. at 36.)

On redirect, Smith denied that he was guilty of the charges against him. (Id. at 37, 39.)

Sergeant Brown was recalled by Smith and he confirmed that Smith told him that shots had been fired at the residence. (Id. at 41.) The officer investigated but did not find evidence of shots fired. (Id.) He related that "[he] checked that bedroom door... [but] [t]here's no holes in that door. I even checked the crack in the door to see if a shot might have went through the crack of the door. There is no holes in that door." (Id.)

On cross-examination, Brown testified that he was aware that Smith has a speech impediment and could not read or write. (Id. At 42.) Brown went over Smith's statement with him

> three times to make sure. I questioned Mr. Smith to the point where I wanted him to be comfortable with what he was telling me. I asked him at the end of taking the statement, "Is there anything else that you want to add to this? Is everything correct," and he agreed that everything in his statement was correct before signing it.

(Id. at 43.) Smith also said there was nothing else he wanted to add. (Id.) He did not tell Brown that DeMoss had pulled a knife on him, and the Sergeant also did not hear that account from any other witness. (Id. at 43-44.) The first time Brown heard Smith say that DeMoss had pulled a knife on him was at trial. (Id.)

Smith has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals on this issue was an unreasonable application of <u>Jackson v. Virginia</u> or was based on an unreasonable factual determination. The evidence at trial was more than sufficient to sustain Smith's conviction for aggravated sexual battery, which is defined in the opinion of the Tennessee Court of Criminal Appeals. <u>State v. Smith</u>, 2007 WL 3132938, at *5. The victim testified to a sexual assault by Smith. The Tennessee Court of Criminal Appeals concluded that "the victim's testimony alone was sufficient evidence for a jury to find the Defendant guilty of the offense with which he was charged." <u>Id.</u> "[Q]uestions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact . . . ." <u>Id.</u> Although other corroboration is not required under Tennessee law, Revelle and Taylor testified that they observed redness and swelling in the victim's genital area that were consistent with her testimony. The victim's demeanor was also consistent with that of a victim of sexual assault. Although Smith hypothesizes that the victim might have been assaulted by Willie Clark (*see* D.E. 1-1 at 3, 5-7), the State is not required to rule out all alternative scenarios.

Petitioner also has not sustained his burden with respect to his challenge to the showing that the touching was for the purpose

of sexual gratification. Although the inmate reiterates the argument he made to the state appellate court that any touching was consistent with a violent assault (D.E. 14 at 5-6), he fails to address the statement of the Tennessee Court of Criminal Appeals that "the statute only requires an intentional touching that can be '*reasonably construed* as being for the purpose of sexual arousal or gratification.'" <u>State v. Smith</u>, 2007 WL 3132938, at *6 (emphasis in original))(additional citations omitted)(quoting Tenn. Code Ann. § 39-13-501(6). He also fails to address the analysis of the Tennessee Court of Criminal Appeals that the jury was entitled to infer that touching the victim's vagina with his penis and mouth was for the purpose of sexual gratification. <u>Id.</u> Although Smith has offered an alternative interpretation of the contact, he has not demonstrated that the analysis of the Tennessee Court of Criminal Appeals was objectively unreasonable.

Thus, the first issue is without merit and is DISMISSED.

**B.    The Challenge to Smith's Sentence (Claim 2)**

In his second issue, Smith argues that the trial court improperly applied enhancement factors to his sentence, failed to consider any mitigating factors and increased his sentence beyond the statutory maximum to a length of twelve years. (D.E. 1 at 7; D.E. 1-1 at 12-14.) According to the inmate, the trial court augmented his sentence after finding that the offense was committed to enhance his pleasure and excitement. That enhancement, argues

Petitioner, was improper because the offense of aggravated sexual battery includes as an element that the contact was for the purpose of sexual gratification. He asserts that use of that enhancement factor violated his Sixth Amendment right to trial by jury. (D.E. 1 at 7; D.E. 1-1 at 12-14.)

Smith challenged the sentence on direct appeal, and the Tennessee Court of Criminal Appeals rejected his position on the merits, stating as follows:

> At the sentencing hearing, the State relied on Defendant's presentence report and L.C.'s victim impact statement, both of which were introduced as exhibits without objection. Defendant did not offer any evidence at the sentencing hearing.
>
> According to the pre-sentence report, Defendant was fifty-three years old at the time of the sentencing hearing. Defendant dropped out of school after completing the ninth grade and acknowledged that he could not read or write. Defendant reported various health problems and said that he was taking medication for depression and insomnia. Defendant denied using drugs but acknowledged that he had previously consumed whiskey on weekends. Defendant reported both successful and unsuccessful efforts in various alcohol rehabilitation programs. Defendant said that he had received psychiatric treatment in the past. Defendant reported that he had not worked in the past ten years other than yard work and odd jobs and received social security disability benefits.
>
> Defendant has numerous prior misdemeanor convictions for public intoxication, vandalism, aggravated criminal trespass, simple possession of cocaine, evading arrest, resisting arrest, assault, harassment, and two DUI convictions. Defendant was convicted of aggravated burglary in 1996 and was sentenced to three years. His sentence was suspended, and Defendant was placed on probation. Defendant was charged with two counts of assault in 2000 against L.C. and Ms. Smith. Defendant was convicted on another assault charge on January 1,

2005. He was sentenced to eleven months, twenty-nine days, all suspended, and Defendant was placed on probation. Defendant was on probation for this assault conviction when he committed the current offense. Defendant's probation for this assault conviction was revoked on November 14, 2005 and reinstated after ninety days.

L.C. wrote in her victim statement that she was still grieving the recent loss of her eighteen-year-old brother in an automobile accident when the sexual assault occurred. L.C. wrote:

> During the attack, I could not believe what was happening. I did not understand why Gregory Smith would want to hurt me. I continually begged him to stop, but he didn't. I fought back as hard as I could, but still he didn't stop. When he finally did decide to stop, I had already been violated — sexually assaulted and bitten on my vagina. I was in pain, both physically and emotionally. I have not been the same person since.

L.C. described the loss of her sense of security and trust and reported fears that Defendant might return to hurt her or her mother again.

At the conclusion of the sentencing hearing, the trial court found that enhancement of Defendant's sentence was appropriate based on the presence of enhancement factor (1), Defendant has a previous history of criminal convictions; factor (7), the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; factor (13), Defendant was on probation when he committed the current offense; and factor (14), Defendant abused a position of private trust. T.C.A. §§ 40-35-114(1), (7), (13), and (14). The trial court did not find that any mitigating factors were applicable. The trial court stated, "I also note that and find specifically [that] confinement is necessary in this case to protect society, of course, by restraining this Defendant, and it's mandatory he be restrained." The trial court found that a sentence of twelve years was appropriate in this case.

On appeal, Defendant does not challenge the applicability of enhancement factors (1), (13), and (14) but argues that the trial court erred in applying

enhancement factor (7) because gratification of a defendant's desire for pleasure or excitement is an essential element of the offense of aggravated sexual battery. Id. § 40-35-114(7). Defendant also contends that the trial court erred in not considering as a mitigating factor the fact that he did not cause the victim serious bodily injury. Id. § 40-35-113(1).

When a defendant challenges the length, range or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Id. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. Id. § 40-35-401, Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result was preferred. State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the offense, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf and (8) the defendant's potential or lack of potential for rehabilitation or treatment. See T.C.A. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Defendant was convicted of aggravated sexual battery which is a Class B felony. T.C.A. § 39-13-504(b). The

offense occurred on July 2, 2005, and Defendant was sentenced under the new law effective for all offenses occurring after June 6, 2005.  Id. § 40-35-210.  As a Range I, standard offender, Defendant's sentence falls within a range between eight and twelve years.  Id. § 40-35-112(a)(2).  The trial court is required to sentence Defendant within the applicable range with consideration of certain advisory guidelines, including the adjustment of the length of the sentence, as appropriate, by the presence or absence of mitigating and enhancement factors.  Id. § 40-35-210(c).

The State argues initially that the 2005 amendments to the Criminal Sentencing Reform Act of 1989 eliminated a criminal defendant's statutory right to appeal a trial court's application of one or more statutory enhancement factors in determining the length of the defendant's sentence.

Both before and after the 2005 amendments, the Criminal Sentencing Reform Act provided that a "defendant in a criminal case may appeal from the length, range or the manner of service of the sentence imposed by the sentencing court."  T.C.A. § 40-35-401(a) (2005) and (2004).  The 2005 amendments provide that an appeal must be related to one or more of the following grounds:

> (1) [t]he sentence was not imposed in accordance with this chapter; (2) [t]he sentence is excessive under the sentencing considerations set out in §§ 40-35-103 and 40-35-210; or (3)[t]he sentence is inconsistent with the purposes of sentencing set out in §§ 40-35-102 and 40-35-103."

Id. § 40-35-401(b) (2005).

Prior to the 2005 amendment to section 40-35-401, subsection (b)(2) read:  "The enhancement and mitigating factors were not weighed properly, and the sentence is excessive under the sentencing considerations set out in § 40-35-103."  The State argues that by eliminating the phrase, "[t]he enhancement and mitigating factors were not weighed properly," and making the statutory enhancement factors advisory only, the Tennessee General Assembly evidenced an intent to eliminate appellate review of a trial court's application of enhancement factors in determining the length of a criminal defendant's sentence.

55

The 2005 amendments arose out of a concern by the Tennessee General Assembly that the provisions of Tennessee's Criminal Sentencing Reform Act of 1989 violated a defendant's constitutional Sixth Amendment right to trial by jury as contemplated by the United States Supreme Court in <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) and its progeny. *See also* <u>Cunningham v. California</u>, 549 U.S. ----, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007); <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). Thus, the 2005 amendments abandoned a statutory presumptive minimum sentence and directed a trial court to impose a sentence within the applicable range. The 2005 amendments set forth certain "advisory sentencing guidelines" which the trial court is required to consider but is not bound by. These include:

> (1) [t]he minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) [t]he sentence length within the range should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c).

Our duty in construing statutes is to ascertain and give effect to the intention and purpose of the legislature. <u>State v. Goodman</u>, 90 S.W.3d 557, 563 (Tenn. 2002). Our supreme court has directed that:

> [l]egislative intent is to be ascertained primarily from the natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language. <u>Alford</u>, 970 S.W.2d at 946; <u>Carter</u>, 952 S.W.2d at 419. Courts are restricted to the natural and ordinary meaning of the language used by the legislature in the statute, unless an ambiguity exists which requires further inquiry to ascertain legislative intent. <u>Browder v. Morris</u>, 975 S.W.2d 308, 311 (Tenn. 1998). The language employed must be considered in the context of the

56

entire statute, and the component parts of a statute should be construed, if possible, consistently and reasonably. <u>Alford</u>, 970 S.W.2d at 946; <u>Wilson</u>, 879 S.W.2d at 809. Furthermore, we are to assume that the legislature used each word in the statute purposely, and that the use of these words is intended to convey a meaning and serve a purpose. <u>Browder</u>, 975 S.W.2d at 311. Where the language of the statute is clear and plain and fully expresses the legislature's intent, resort to auxiliary rules of construction is unnecessary, and we need only enforce the statute. <u>Id.</u>

<u>Goodman</u>, 90 S.W.3d at 563-64.

A defendant has the statutory right to appeal a sentence not imposed in accordance with the Criminal Sentencing Reform Act. T.C.A. § 40-35-401(b)(1). Specifically, a defendant may raise as a ground on appeal that his sentence is excessive under the sentencing considerations set forth in section 40-35-210, which section includes a trial court's consideration of enhancement factors in determining the length of a sentence. <u>Id.</u> § 40-35-210(c)(2). The trial court is required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." <u>Id.</u> § 40-35-210(d). Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-401(c)(2). Thus, Defendant's challenge to the length of his sentences relate to the sentencing considerations set forth in Tennessee Code Annotation section 40-35-210, and we will consider his issue concerning the trial court's application of enhancement factors on the merits.

With respect to the trial court's application of enhancement factors, we must agree with Defendant that the trial court incorrectly applied enhancement factor (7) to his conviction of aggravated sexual battery as that offense necessarily includes the intent to gratify a desire for pleasure or excitement. *See, e.g.,* <u>State v. Kissinger</u>, 922 S.W.2d 482, 489-490 (Tenn. 1996); T.C.A. § 40-35-114 (authorizing the trial court to consider certain enhancement factors "[i]f appropriate for the offense and if not already an essential element of the offense").

57

We note initially that Defendant did not ask the trial court to consider any factors in mitigation of his sentence including mitigating factor (1), based on the assertion that Defendant's criminal conduct did not cause or threaten to cause serious bodily injury. Nonetheless, this Court has used the lack of serious bodily injury or the absence of that threat as a proper mitigating factor in aggravated sexual battery cases. State v. Hayes, 899 S.W.2d 175, 187 (Tenn. Crim. App.); State v. Robert Wilson, No. 03-C-01-9209-CR-00305, 1993 WL 79626, at *4 (Tenn. Crim. App., at Knoxville, March 22, 1993), *no perm. to appeal filed.* This Court has also declined to use this mitigating factor. State v. Clabo, 905 S.W.2d 197, 207 (Tenn. Crim. App. 1995) (charges of aggravated sexual battery and aggravated rape); State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994) (refusing to apply mitigating factor when the defendant gave his victims alcohol and sexually abused them resulting in aggravated rape and aggravated sexual battery charges).

While Defendant's conduct did not cause "serious bodily injury" as that term is defined in T.C.A. § 39-11-106(a)(33), it was threatened and could have occurred. "Serious bodily injury" includes bodily injury involving extreme physical pain. Id. § 39-11-106(a)(33)(c). The sexual attack was violent as evidence [sic] by L.C.'s testimony that Defendant threw her down on the floor. L.C. repeatedly attempted to fight off Defendant's assault, but he bit her in the vaginal area and would not let go. L.C. stated that "[i]t was like his mouth was attached to me." The trial court specifically noted that this was "a very serious case" with "obviously physical trauma" to the victim. Based on our review, we conclude that consideration of this factor in mitigation of the length of Defendant's sentence would be inappropriate under the facts presented in this case.

The presence of the three other enhancement factors are supported by the record. Defendant's prior history of criminal convictions is lengthy and includes two assault charges involving L.C. and her mother. Defendant is L.C.'s stepfather and committed the offense at a time when the two were alone in the home. Defendant committed the offense while he was on probation for another offense. We conclude that the trial court did not err in

sentencing Defendant to twelve years. Defendant is not
entitled to relief on this issue.

State v. Smith, 2007 WL 3132938, at *6–11.

Any claim that the state courts misapplied Tennessee law in
sentencing Smith is not cognizable in a federal habeas petition.
See 28 U.S.C. § 2254(a)(a federal court may grant habeas relief to
a state prisoner "only on the ground that he is in custody in
violation of the Constitution or laws or treaties of the United
States"). Error in the application of state law is not cognizable
in a federal habeas proceeding. Estelle v. McGuire, 502 U.S. 62,
67–68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991)("it is not the
province of a federal habeas court to reexamine state-court
determinations on state-law questions"); Pulley v. Harris, 465 U.S.
37, 41, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984)("A federal
court may not issue the writ on the basis of a perceived error of
state law."). This Court cannot consider whether Smith's sentence
was imposed in violation of Tennessee law.

Although the Petition also asserts that the sentence was
imposed in violation of the Sixth Amendment, Respondent contends
that Smith's federal constitutional claim is barred by procedural
default. (D.E. 10 at 22–23.) A prisoner exhausts a claim by
"fairly present[ing]" it to the appropriate trial and appellate
courts. Baldwin v. Reese, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349,
158 L. Ed. 2d 64 (2004).

A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

Newton v. Million, 349 F.3d 873, 877 (6th Cir. 2003)(internal quotation marks omitted), *abrogated on other grounds by* English v. Berghuis, ___ F. App'x ___, 2013 WL 3455482, at *10-11 (6th Cir. 2013). "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,* 532 U.S. 958, 121 S. Ct. 1487, 149 L. Ed. 2d 374 (2001).

Smith's brief to the Tennessee Court of Criminal Appeals phrases his sentencing claim as arising under state law and, specifically, as a misapplication of a statutory enhancement factor and failure to apply a statutory mitigating factor.[8] The brief cited no federal cases, made no constitutional arguments, and did not refer in any way to the United States Constitution or any right arising thereunder.

In his Reply, Petitioner argues that he raised his Sixth Amendment claim in his application for permission to appeal to the Tennessee Supreme Court from the decision of the Tennessee Court of

---

[8]     *See* D.E. 9-7 at 18–21.

Criminal Appeals on direct appeal. (D.E. 14 at 3-4.) Although he is correct that his application for permission to appeal included a Sixth Amendment claim,[9] that does not constitute a fair presentation of the issue to the state courts. <u>Castille v. Peoples</u>, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060, 103 L. Ed. 2d 380 (1989)(stating that a claim has not been fairly presented to the state courts where it "has been presented for the first and only time in a procedural context in which its merits will not [ordinarily] be considered"), *reh'g denied,* 490 U.S. 1076, 109 S. Ct. 2091, 104 L. Ed. 2d 654 (May 15, 1989). The circumstances under which the Tennessee Supreme Court will exercise its discretion to grant permission to appeal are set forth in Tennessee Rules of Appellate Procedure 11(a), which provides:

> An appeal by permission may be taken from a final decision of the Court of Appeals or Court of Criminal Appeals to the Supreme Court only on application and in the discretion of the Supreme Court. In determining whether to grant permission to appeal, the following, while neither controlling nor fully measuring the court's discretion, indicate the character of reasons that will be considered: (1) the need to secure uniformity of decision, (2) the need to secure settlement of important questions of law, (3) the need to secure settlement of questions of public interest, and (4) the need for the exercise of the Supreme Court's supervisory authority.

The Sixth Amendment issue in this case does not satisfy any of the criteria in Rule 11(a), particularly where, as here, the issue was not presented to the Tennessee Court of Criminal Appeals. Thus, the fact that Smith raised this issue in his application for

---

[9]     *See* D.E. 9-7 at 68–91.

permission to appeal the decision of the Tennessee Court of Criminal Appeals on direct appeal does not alter the conclusion that he failed to exhaust his Sixth Amendment claim in state court. Because there is no longer any means of presenting the claim to the state courts, it is barred by procedural default.

The second issue is without merit and is DISMISSED.

**C.    Ineffective Assistance of Counsel (Claim 3)**

In his third issue, Smith asserts that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, for failing to investigate, present a defense and call certain witnesses. (D.E. 1 at 8; D.E. 1-1 at 14–16.)  The factual basis for this issue is that "COUNSEL WAS DEFICIENT FOR FAILING TO INVESTIGATE THE CASE BY NOT CONFERRING WITH PETITIONER AND DEVELOPING PETITIONER'S THEORY OF DEFENSE: REVIEWING DISCOVERY FILES: FAILED TO DISCUSS THE CASE WITH PETITIONER AND PREPARE HIM FOR TRIAL: DID NOT DISCUSS PLEA NEGOTIATIONS: AND, FAILED TO ALLOW PETITIONER TO ASSIST IN HIS OWN DEFENSE." (D.E. 1 at 8.)  In his legal memorandum, Petitioner emphasized that his attorney did not elicit testimony that he could not have bitten the victim because he did not have front teeth. (D.E. 1-1 at 15.)  Trial counsel also failed to call Roderick Diggens to testify to the narrow window of opportunity for the assault and the calm demeanor of the victim and failed to call Willie Clark, who would have corroborated the testimony of Diggens. (Id. at 15–16.)

Smith raised these issues during the postconviction proceedings. The Tennessee Court of Criminal Appeals summarized the proof introduced at the postconviction hearing:

> The petitioner testified that his children retained trial counsel to represent him during the case. According to the petitioner, trial counsel never visited him in the jail, never provided him with copies of discovery or discussed the State's evidence against him, never discussed the facts of the case with him, and failed to prepare the petitioner to testify at trial. He also stated that he was not informed of any plea offers made by the State. The petitioner further asserted that, although he gave trial counsel a list of potential witnesses, trial counsel did not interview them or call them to testify at trial. According to the petitioner, trial counsel should have called the petitioner's children and his sister as witnesses, along with two friends who were present around the time of the incident. The petitioner acknowledged that the two friends he wished to have called as witnesses were not present at the time of the actual incident. Finally, the petitioner testified that trial counsel should have introduced into evidence the fact that he had no teeth at the time of the incident, in order to rebut the victim's testimony that he bit her.
>
> Next to testify was Roderick Diggins, who stated that he had known the petitioner for several years.[10] He stated that he had given the petitioner a ride home on the day of the incident and had gone inside the home when they arrived. Willie Clark was also present at the time, and the three men remained in the petitioner's home for approximately fifteen minutes. Mr. Clark then asked Mr. Diggins to take him to the store, and the two men left. Mr. Diggins stated that they were gone no more than ten minutes and, upon their return, he observed the victim speaking with another young lady outside the house. According to Mr. Diggins, the victim was dressed in "nice clothes," and he got the impression that she was going somewhere. He also testified that the victim appeared calm and was not crying or screaming. Mr. Diggins stated that trial counsel spoke with him for the first time on

---

[10]     This witness's name is spelled "Diggens" in the trial transcript and the opinion of the Tennessee Court of Criminal Appeals on direct appeal.

the day of trial and that trial counsel did not call him
as a witness, although he was available to testify. Mr.
Diggins also testified that Mr. Clark has passed away
after the trial but prior to the post-conviction hearing.
On cross-examination, Mr. Diggins acknowledged that he
had no way of knowing where the victim intended to go
when he saw her on the day of the incident and that he
could not contradict the testimony of the emergency room
physician or nurse who stated that the victim was so
distraught at the hospital that she had to be sedated.

Trial counsel testified that he was retained by the
petitioner's family to represent him and that he had
previously represented the petitioner in a simple assault
case. In contradiction to the petitioners [sic[
testimony, trial counsel stated that he met with the
petitioner at the jail between two and four times and had
reviewed the discovery materials with the petitioner.
Trial counsel testified that he tried to negotiate a plea
agreement with the State, but the petitioner refused any
negotiations as he insisted he was innocent. Trial
counsel testified that there was an informal offer of
twenty years, but the petitioner refused the agreement.

Trial counsel acknowledged that the petitioner had
given him a list of possible witnesses that included Mr.
Diggins, Ms. DeMoss, and Lavonta Cook. However, based
upon information discovered during his investigation,
trial counsel did not interview the potential witnesses.
He did speak with Mr. Diggins immediately prior to the
trial but decided against calling him as a witness
because he was not present during the actual time period
the crime was alleged to have occurred. Mr. Diggins was
not a fact witness, and the substance of his testimony,
that the victim appeared calm, was contradicted by both
the emergency room doctor and the nurse. Moreover, Mr.
Diggins had a prior criminal history. Finally, trial
counsel noted that Ms. DeMoss did, in fact, testify at
trial.

According to trial counsel, he "banked" his defense
strategy on a nonconclusive rape kit and believed that
the State's case had "holes" in it. He stated that he
did investigate the victim's sexual history and thought
it aided the petitioner's case that the jury saw that the
victim was pregnant with another man's child at trial.
He also testified that he believed he had effectively
cross-examined all the witnesses who testified.

<u>Smith v. State</u>, 2009 WL 302966, at *4–5.

The Tennessee Court of Criminal Appeals affirmed the postconviction court's denial of relief, stating as follows:

> On appeal, the petitioner contends that the trial court erred in denying his petition for post-conviction relief because he was denied his Sixth Amendment right to the effective assistance of counsel. To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975). Under <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), the petitioner must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. <u>Adkins v. State</u>, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. <u>Cooper v. State</u>, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

> It is unnecessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>State v. Burns</u>, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068).

> The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. <u>Id.</u> at 461. "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of

counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." <u>Fields v. State</u>, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); <u>Henley v. State</u>, 960 S.W.2d 572, 578 (Tenn. 1997)). However, *conclusions of law,* are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. <u>Id.</u>

On appeal, the petitioner specifically contends that trial counsel was ineffective by failing to: (1) adequately investigate; (2) adequately communicate with the petitioner, provide and discuss discovery, prepare the petitioner to testify, or convey plea offers; (3) elicit facts helpful to the defense at trial, namely the petitioner's lack of teeth; and (4) interview and call witnesses for the defense. In denying relief, the post-conviction court found as follows:

> ... It's clear from the proof today, in the Court's opinion, that the Petitioner has failed to carry the burden of proof by clear and convincing evidence in that regard. There were strategy decisions to be made for purposes of this trial. Those decisions were made through the client and counsel as to which individuals should be called as witnesses. In hearing the testimony of Mr. Diggins today, very limited to what he could testify to if he had been called, basically he saw this — at this point it would have been the alleged victim sometime after outside but at some distance of probably 15 feet from a very limited observation really could [not] add anything. But [trial counsel] had strategy decisions to make, and I do [not] find that in any way has he dropped below the standard required of counsel in representation.

> He testified he met with his client as many as four times in preparation for trial. He was already familiar with [the petitioner] because he [had] represented him on recent prior occasions.

> It was a credibility issue for the jury, and the jury heard the testimony of the eight various witnesses and made a determination. The jury found [the petitioner] guilty of a lesser included offense in making their finding of fact.

Review of the record reveals nothing which preponderates against the trial court's findings. Based upon its findings, the post-conviction court resolved the issues of credibility presented in favor of trial counsel. It is not the province of this court to reweigh or reevaluate such determinations on appeal, as issues of credibility of witnesses and the weight to be given the testimony are to be resolved by the trier of fact. *See* Henley, 960 S.W.2d at 579. In contradiction to the petitioner, trial counsel testified that he met with the petitioner on multiple occasions, discussed the facts of the case and possible defenses, and provided and reviewed discovery with the petitioner. Moreover, trial counsel testified that he had discussions with the State regarding plea offers and conveyed those offers to the petitioner, but the petitioner refused to consider any offers as he insisted that he was innocent. He specifically stated that he investigated the victim's prior sexual history and decided to pursue a defense based upon the nonconclusive rape kit. Thus, trial counsel's testimony refuted each of the petitioner's claims, and, as the post-conviction court accredited his testimony, the petitioner has failed to carry his burden with regard to these issues.

No proof was presented with regard to the petitioner's assertion that trial counsel failed to present facts helpful to the defense, namely that the petitioner had no teeth, other than the petitioner's own testimony that it was not put forth. Trial counsel was not questioned regarding this issue at the post-conviction hearing, and no transcript of the evidence was introduced. Thus, the petitioner has failed to carry his burden of establishing deficient performance, especially in light of the fact that the emergency room doctor testified at trial that he did not notice any teeth marks in the victim's vaginal area.

Finally, nothing preponderates against the post-conviction court's finding that trial counsel's decision to not call Mr. Diggins as a witness was a matter of trial strategy. Trial counsel testified that he interviewed Mr. Diggins on the morning of trial and discussed what the substance of his testimony would be if he was called. Based upon the fact that Mr. Diggins was not present in the home at the time the assault was alleged to have occurred, trial counsel did not see that calling him was a good strategic decision. According to

trial counsel, and supported by Mr. Diggins own testimony at the post-conviction hearing, all Mr. Diggins could testify to would be that shortly after the incident occurred, the victim, seen from a distance, appeared calm. The testimony would have been contradicted by Ms. DeMoss, who testified at trial that the victim was upset and crying when she arrived. Additionally, both the emergency doctor and nurse testified that the victim was so distraught that she had to be sedated in order to be examined. In light of these contradictions, especially in light of Mr. Diggins' prior criminal history, we, as did the post-conviction court, must conclude that trial counsel exercised his discretion in making a valid strategic decision. As previously noted, the petitioner is not entitled to criticize a sound tactical decision made after adequate preparation. *See* <u>Cooper</u>, 847 S.W.2d at 528.

<u>Smith v. State</u>, 2009 WL 3029666, at *5-7.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 862 (June 25, 1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688, 104 S. Ct. at 2064. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" <u>Harrington v. Richter</u>, ___

68

U.S. \_\_\_, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011)(internal citations omitted)(quoting <u>Strickland</u>, 466 U.S. at 687 & 689, 104 S. Ct. at 2052 & 2066).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.[11] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" <u>Richter</u>, \_\_\_ U.S. at \_\_\_, 131 S. Ct. at 787–88(internal citations omitted)(quoting <u>Strickland</u>, 466 U.S. at 687 & 693, 104 S. Ct. 2064 & 2067); *see also* <u>id.</u> at \_\_\_, 131 S. Ct. at 791–72 ("In assessing prejudice under <u>Strickland</u>, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); <u>Wong v. Belmontes</u>, 558 U.S. 15, 27, 130 S. Ct.

---

[11] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." <u>Strickland</u>,466 U.S. at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. <u>Id.</u>

383, 390-91, 175 L. Ed. 2d 328 (2009)(per curiam)("But Strickland does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different."), *reh'g denied*, 558 U.S. 1138, 130 S. Ct. 1122, 175 L. Ed. 2d 931 (Jan. 11, 2010).

"Surmounting Strickland's high bar is never an easy task." Padilla v. Ky., 559 U.S. 356, 371, 130 S. Ct. 1473, 1385 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S. Ct. 2052; *see also* Bell v. Cone, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S. Ct. 2052.

Richter, ___ U.S. at ___, 131 S. Ct. at 788.

When an ineffective-assistance claim is reviewed under § 2254(d), the review is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009).

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689, 104 S. Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at ----, 129 S. Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, ___ U.S. at ___, 131 S. Ct. at 788.

Smith's Petition does not state whether he contends that the decision of the Tennessee Court of Criminal Appeals on his ineffective assistance claim was contrary to, or an unreasonable application of, Strickland v. Washington, or whether it was based on an unreasonable factual determination. The decision was a run-of-the-mill case applying the correct legal standard from Strickland to the facts of Smith's case and, therefore, the "contrary to" clause is inapplicable.

Petitioner also has not satisfied his burden of demonstrating that the state-court decision was an unreasonable application of Strickland or was based on an objectively unreasonable factual determination. The postconviction court resolved the conflicting testimony of Smith and his trial counsel, Colin Morris, in favor of Morris, and Smith has made no showing that that credibility

determination was objectively unreasonable. Morris testified that he was retained by Smith's family to represent him at some time prior to the arraignment. (D.E. 9-6 at 68–69.) Before trial, Morris met with Smith at the Madison County Jail "[p]robably two or three or four [times], somewhere in that area." (Id. at 69.) Counsel testified that he reviewed the discovery with Smith, stating that "I reviewed everything I had with him. I think I might even have made him a copy." (Id. at 69–70.)

During trial preparation, the inmate provided his attorney with the names of witnesses he wanted to call, including "Mr. Diggins, Mr. [sic] DeMoss, and there was a kid by the name of Lavonta Cook." (Id. at 71.) Morris confirmed that he did not meet with Diggens until the day of trial, stating that "[h]e was a witness I deemed I would wait and see. Anyway, I waited and saw, and I didn't think it was a good idea to call him under the circumstances." (Id. at 72–73.) Morris believed that Diggens would not be a good witness because "he didn't see anything" and because he preferred to focus on the inconclusive rape test kit. (Id.) The attorney believed there were "holes" in the State's case. (Id. at 76.) He explained:

> Well, the girl took a bath right after this alleged incident, you know, and the family and Mr. Smith was of the opinion that if she was raped, why in the heck would she take a bath? As Mr. Diggins testified, she made herself up, and it looked like she was going to Wal-Mart or to the mall or something like that, but what ended up happening through the testimony was that she got overly excited once she left that house and went to the

emergency room, and the rape kit, it was inconclusive.
I thought that was big in this case.

(<u>Id.</u> at 77.)  Smith was ultimately convicted of aggravated sexual
battery, a lesser offense than aggravated rape.  (<u>Id.</u> at 78.)

Morris also testified that he attempted to negotiate a plea
agreement and believed the State had made an informal offer of
twenty years.  (<u>Id.</u> at 70-71.)  He recalled that "Mr. Smith
maintained his innocence, and I was on his side and advocating his
position, and we just couldn't reach an agreement . . . ."  (<u>Id.</u> at
70.)

On cross examination, counsel testified that the substance of
Diggens' testimony would have been that, when he saw the victim,
she appeared to be calm.  (<u>Id.</u> at 81.)  Morris explained that "[h]e
wasn't inside the house is why I didn't use him."  (<u>Id.</u>)  He
recalled that a doctor and nurse testified that the victim was
visibly upset and needed to be sedated before an examination could
be performed.  (<u>Id.</u> at 81-82.)  Morris also recalled that Diggens
had a criminal record.  (<u>Id.</u> at 82.)

Morris also agreed that, through his efforts, Smith was
convicted of a B felony rather than an A felony.  (<u>Id.</u>)  Blondale
DeMoss, one of the witnesses Smith wanted to call, testified at
trial but her testimony was not favorable to Smith.  (<u>Id.</u> at
83-84.)[12]

---

[12]     Morris was not asked about the failure to call the victim's uncle,
Willie Clark, to testify at trial.  Smith testified at the postconviction hearing
(continued...)

The record fully supports the decision of the Tennessee Court of Criminal Appeals that these aspects of Smith's ineffective assistance claim are meritless. The postconviction court credited Morris's testimony that he met with Petitioner, that he shared discovery with Smith, and that he tried, unsuccessfully, to obtain a favorable plea offer. The postconviction court also accepted trial counsel's explanation for his strategic decision not to call Diggens to testify. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." <u>Strickland</u>, 466 U.S. at 690, 104 S. Ct. at 2066. Smith makes no argument that Morris was not aware of the testimony Diggens could have offered.

The only evidence offered in support of Smith's complaint that his attorney failed to elicit testimony that he could not have bitten the victim because he lacked front teeth is Smith's statement at the postconviction hearing that "I didn't have no teeth in front." (D.E. 9-6 at 54.) Smith stated that that issue was not developed at trial. (<u>Id.</u>) The inmate was not asked whether he suggested this line of questioning to his attorney, and Morris was not asked whether he considered asking Smith about his missing front teeth. Although the postconviction transcript reflect that Smith's attorney moved the admission of "a copy of the

---

    [12]    (...continued)
that Clark was alive at the time of trial but had since died. (D.E. 9-6 at 50, 64.)

transcript of the appellate record that shows the testimony in this case" (id. at 84), Exhibit 2 to the postconviction hearing is a copy of the opinion of the Tennessee Court of Criminal Appeals on direct appeal rather than the trial transcript (id. at 119-30). Therefore, the statement of the Tennessee Court of Criminal Appeals that Smith "failed to carry his burden to establish deficient performance," Smith v. State, 2009 WL 3029666, at *7, is not based on an objectively unreasonable factual finding. Smith also fails to address the reference of the Tennessee Court of Criminal Appeals to the trial testimony of the emergency room doctor "that he did not notice any teeth marks on the victim's vaginal area." Smith v. State, 2009 WL 3029666, at *7.[13]

Claim 3 also is without merit and is DISMISSED.

Because every claim asserted by Petitioner is without merit, the Court DENIES the Petition. The Petition is DISMISSED WITH PREJUDICE and judgment shall be entered for Respondent.

## IV.       APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. Miller-El v. Cockrell, 537 U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005), reh'g en banc denied (Jan. 10, 2006). The Court must issue or deny a certificate

---

[13]     See State v. Smith, 2007 WL 3132938, at *2 ("Dr. Ravelle said that L.C.'s physical examination revealed a great deal of swelling in the vaginal area. Dr. Ravelle did not notice any teeth marks but stated that the redness and swelling were consistent with some type of pinching or biting.").

of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.  A petitioner may not take an appeal unless a circuit or district judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing.  28 U.S.C. § 2253(c)(2) & (3).  A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  Cockrell, 537 U.S. at 336, 123 S. Ct. at 1039; see also Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009)(per curiam)(same), cert. denied, 555 U.S. 1160, 129 S. Ct. 1057, 173 L. Ed. 2d 482 (2009).  A COA does not require a showing that the appeal will succeed.  Cockrell, 537 U.S. at 337, 123 S. Ct. at 1039; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011).  Courts should not issue a COA as a matter of course.  Bradley, 156 F. App'x at 773.

In this case, there can be no question that the Petition is meritless for the reasons previously stated.  Because any appeal by

Petitioner on the issues presented does not deserve attention, the Court DENIES a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5). In this case, for the same reasons it denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is DENIED.[14]

IT IS SO ORDERED this 25th day of September, 2013.

s/J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[14]     If Petitioner files a notice of appeal, he must pay the full $455 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).